106 F.3d 1263
 79 A.F.T.R.2d 97-942, 97-1 USTC P 60,258
 ESTATE OF Marguerite S. MILLIKIN, Quentin Alexander,
Executor and Severance A. Millikin Trust B Society
National Bank, fka AmeriTrust Company,
Trustee, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 96-1012.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 12, 1996.
Decided Feb. 12, 1997.
 
 Irene C. Keyse-Walker, Robert E. Glaser (argued and briefed), Arter & Hadden, Cleveland, OH, for Petitioners-Appellants.
 Gary R. Allen, Acting Chief (briefed), Jonathan S. Cohen, Tamara L. Schottenstein (argued), U.S. Department of Justice, Appellate Section Tax Division, Washington, DC, for Respondent-Appellee.
 Before: CONTIE, SUHRHEINRICH, and MOORE, Circuit Judges.
 MOORE, Circuit Judge.
 
 
 1
 This is an estate taxation case in which the petitioners, representing the estate of Marguerite S. Millikin, appeal the decision of the United States Tax Court denying a deduction of administration expenses for the maintenance and sale of the decedent's residence incurred after the filing of the estate tax return. Petitioners assert that as a matter of Ohio law the maintenance and selling expenses were necessary for the administration of the estate beyond the filing of the tax return. We disagree and, accordingly, affirm the decision of the Tax Court.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 2
 The facts in this case were stipulated by the parties. Marguerite S. Millikin, a resident of Ohio, died testate on June 18, 1989. Marguerite's spouse, Severance A. Millikin, had predeceased her, leaving three trusts that he had established during his lifetime: (1) Trust A, "Endowment Fund," a charitable trust for the benefit of three Cleveland-area non-profit organizations (Cleveland Museum of Art, Case Western Reserve University, and University Hospitals of Cleveland); (2) Trust B, "Marital Trust," a marital deduction trust with general power of appointment in Marguerite under which, if not exercised at her death, any unappointed portion of the Trust B corpus would transfer to Trust C; and (3) Trust C, "Family Trust," a residuary trust for twenty-eight family beneficiaries. J.A. at 143-57. Society National Bank is the acting trustee of all three trusts, with Quentin Alexander serving as the sole advisory trustee after Marguerite's death. The trustee is empowered to sell any trust property with approval of the advisory trustee.
 
 
 3
 Marguerite executed a Last Will and Testament on November 19, 1987, in which she designated Quentin Alexander as executor of her estate. Alexander's wife was the Millikins' niece. Marguerite's will was probated in the Probate Court of Cuyahoga County, Ohio. Marguerite's gross estate included the property held by Trust B because it was subject to her general power of appointment. See I.R.C. § 2041(a). The Trust B assets, however, were not probate assets and were not subject to claims against the decedent's estate.
 
 
 4
 Marguerite's gross estate was reported in the estate tax return as $22,851,356.30, including a 150-acre estate in Gates Mills, Ohio called Ripplestone, consisting of a main house, a detached garage, various cottages, a barn, a stable, a swimming pool, and a tennis court. J.A. at 78. The main house contained a climate-controlled gallery to display the Millikins' extensive art collection (estimated at $1.5 million). In accordance with Severance's will, title to Ripplestone was transferred to Trust B on May 7, 1986, where ownership remained at all times pertinent to this action. Trust B paid the expenses to maintain Ripplestone prior to and after Marguerite's death. Even though the expenses to maintain Ripplestone were technically not part of the probate estate, Alexander elected to report the expenses to the probate court in his periodic accountings. J.A. at 44-75.
 
 
 5
 Marguerite's will authorized her executor to sell any of her estate as he deemed necessary without obtaining the approval of any person or court. She left the residue of her estate to an inter vivos trust she had previously established ("Marguerite Trust"). With respect to personal property, she granted the Cleveland Museum of Art a right to select and retain any objects of art, including paintings, books, porcelains, furniture, and silver. J.A. at 173. Marguerite also partially exercised her power of appointment over Trust B by appointing $2 million to be allocated to Trust A and distributed to the identified charitable organizations. J.A. at 174-75. Marguerite further designated in her will that all federal and state estate and death taxes owed as a result of Trust B assets being included in her gross estate for tax purposes were to be paid from Trust B itself.[1] At the date of Marguerite's death, Trust B held assets which were worth $9,026,540.75, not including Ripplestone.[2] J.A. at 102.
 
 
 6
 When Marguerite died, Alexander and the trustee assumed control of Ripplestone and decided to sell the property as soon as possible, but not before they distributed the art collection and other items of personal property inside Ripplestone. Alexander reduced Ripplestone's staff, keeping enough people to maintain the house and grounds while the Cleveland Museum of Art selected the items it wanted. Several times during 1989 and 1990 various museum staff members went to Ripplestone to analyze the collection. By March of 1990, the museum had finished its selection process and the remaining personal property was sold. On March 20, 1990, Ripplestone was offered for sale. Because of the premium asking price (initially $4.2 million), necessary environmental remediation efforts (six underground fuel storage tanks had leaked and contaminated nearby soil, a situation which came to light only after the estate tax return was filed), and certain zoning laws that precluded subdivision of the property, Ripplestone proved difficult to sell. Ripplestone was eventually sold on April 20, 1994, for $2,301,750. Selling expenses were $142,079.70. Tax Ct. Mem. at 7; J.A. at 20.
 
 
 7
 The estate filed its federal estate tax return on March 16, 1990, asserting $3,892,355.31 total federal estate tax liability and $1,379,745.66 federal generation-skipping transfer tax liability, and claiming a credit of $1,071,656.26 for state death taxes paid. J.A. at 78, 120. The executor deducted $555,409.20 in funeral and administration expenses, including $150,000 estimated costs for selling Ripplestone. J.A. at 107, 108. In total, charitable organizations received over $12 million of Marguerite's gross estate. J.A. at 115.
 
 
 8
 The Internal Revenue Service ("IRS") audited the estate and on February 25, 1993, issued notices of deficiency showing deficiencies of $682,367 in estate tax and $67,529 in generation-skipping transfer tax arising from discrepancies in the valuation of Ripplestone. J.A. at 126, 133. Ripplestone was appraised twice after Marguerite's death: at $3.7 million as of July 19, 1989; and at $3 million as of November 22, 1991. J.A. at 74, 75. The executor valued Ripplestone at $3.2 million on the tax return. The IRS disputed the valuation, explaining that Ripplestone's value should have been reported at $3.7 million. J.A. at 132, 135.
 
 
 9
 The estate challenged the deficiency notices by filing a petition in the Tax Court on May 17, 1993, seeking redetermination of the deficiencies. In light of the environmental remediation and other selling obstacles, the parties eventually stipulated that the fair market value of Ripplestone at the time of Marguerite's death was only $2.4 million, thereby mooting the valuation dispute. J.A. at 39.
 
 
 10
 In the meantime, however, Alexander notified the IRS of additional administration expenses for maintaining and selling Ripplestone incurred after the 1990 filing of the estate tax return. See J.A. at 13. This is where the present dispute arose, for the IRS claimed that the estate was not entitled to deduct such expenses.
 
 
 11
 The issue of deductibility of these additional administration expenses went to trial before the Tax Court on February 10, 1994. The Tax Court determined that deductibility was governed by Ohio law and that an Ohio probate court would allow an estate to pay administration expenses only to the extent that those expenses were necessary, reasonable, and just. Tax Ct. Mem. at 13-14; J.A. at 26-27. The Tax Court decided that the executor could deduct administration expenses incurred to maintain and sell Ripplestone prior to March 16, 1990, but not after that date. Tax Ct. Mem. at 2; J.A. at 15. According to the Tax Court, the sale of Ripplestone was not "necessary" to insure that sufficient assets were in reserve for contingent tax and other liabilities, as Ripplestone had been intended for sale long before the notices of deficiency, and Trust B held over $9 million in liquid assets that could have been used to pay any deficiencies. The Tax Court concluded that based on the stipulated reduction in value of Ripplestone, there had been overpayments of $422,289.31 in estate tax and $168,000.66 in generation-skipping transfer tax. Tax Ct. Dec.; J.A. at 34. On September 26, 1995, the Tax Court entered a decision that disposed of all issues and was, therefore, final and appealable. Id.
 
 II. ADMINISTRATION EXPENSES
 
 12
 As the facts are not in dispute, and the only question presented in this appeal is whether the law was correctly applied to those facts by the Tax Court, our review is de novo. Mitchell v. Commissioner, 73 F.3d 628, 631 (6th Cir.1996). The Tax Court's determinations of state law are likewise reviewed de novo. See Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991) (holding de novo review of district court's state law determinations is required in diversity case).
 
 A. Federal Law
 
 13
 The estate seeks to deduct as administration expenses under I.R.C. § 2053 amounts expended by the executor with respect to the maintenance and sale of decedent's residence incurred after the estate tax return's filing date of March 16, 1990.
 
 
 14
 For federal estate tax purposes, expenses of administering the probate estate, deductible under I.R.C. § 2053(a), are distinguished from expenses incurred in administering nonprobate assets, deductible under I.R.C. § 2053(b). Because Ripplestone was actually owned by Trust B and was only included in Marguerite's gross estate because of her general power of appointment over Trust B property, see I.R.C. § 2041, Ripplestone is properly considered nonprobate property. Section 2053(b) provides that an estate may deduct expenses to administer nonprobate property if: (i) the nonprobate property is included in the gross estate (undisputed here); (ii) the expenses are paid before the period of limitation for assessment expires (conceded by the IRS, see Appellee's Br. at 19); and (iii) the expenses would be allowable under § 2053(a) if the property were probate property. See I.R.C. § 2053(b); Treas. Reg. § 20-2053-8. Thus, under the present circumstances, the distinction between probate and nonprobate assets loses its significance. The question before us is whether the expenses to maintain and sell Ripplestone after the estate tax return filing date would be deductible if Ripplestone was a probate asset.
 
 
 15
 Section 2053(a) provides that the taxable estate is to be determined by deducting from the gross estate such amounts for funeral expenses, administration expenses, claims against the estate, and certain indebtedness with respect to estate property "as are allowable by the laws of the jurisdiction ... under which the estate is being administered." I.R.C. § 2053(a). Treasury Regulation § 20.2053-1(b)(2) addresses the effect of a state court decree:
 
 
 16
 The decision of a local court as to the amount and allowability under local law of a claim or administration expense will ordinarily be accepted if the court passes upon the facts upon which deductibility depends.... .... It must appear that the court actually passed upon the merits of the claim. This will be presumed in all cases of an active and genuine contest.... The decree will not be accepted if it is at variance with the law of the State[.]
 
 
 17
 Thus, the decree of a local court ordinarily controls the federal estate tax deductibility only where the requisite foundation has been established.
 
 
 18
 Federal regulations under I.R.C. § 2053 provide the federal standard for deductibility of administration expenses. Treasury Regulation § 20.2053-3(a) states that amounts deductible as "administration expenses" are limited to expenses "actually and necessarily, incurred in the administration of the decedent's estate." That regulation further elucidates that "actually and necessarily incurred" in estate administration means:
 
 
 19
 [I]n the collection of assets, payment of debts, and distribution of property to the persons entitled to it. The expenses contemplated in the law are such only as attend the settlement of an estate and the transfer of the property of the estate to individual beneficiaries or to a trustee.... Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions.
 
 
 20
 Id.
 
 
 21
 The regulations then consider the application of these general principles to specific types of administration expenses. Expenses with respect to preserving and distributing estate property are classified as miscellaneous administration expenses by Treas. Reg. § 20.2053-3(d). As to the expenses to maintain property, that regulation provides:
 
 
 22
 Expenses necessarily incurred in preserving and distributing the estate are deductible, including the cost of storing or maintaining property of the estate, if it is impossible to effect immediate distribution to the beneficiaries. Expenses for preserving and caring for the property may not include outlays for additions or improvements; nor will such expenses be allowed for a longer period than the executor is reasonably required to retain the property.
 
 
 23
 Treas. Reg. § 20.2053-3(d)(1). Likewise, the regulation provides that expenses for selling estate property are deductible only "if the sale is necessary in order to pay the decedent's debts, expenses of administration, or taxes, to preserve the estate, or to effect distribution." Treas. Reg. § 20.2053-3(d)(2).
 
 B. Estate of Park v. Commissioner
 
 24
 Petitioners rely upon Estate of Park v. Commissioner, 475 F.2d 673 (6th Cir.1973), as controlling authority for their contention that the expenses at issue are deductible. In that case, this court reversed the Tax Court's denial of deductibility and allowed the estate to deduct real estate selling expenses that had been approved by a Michigan probate court applying state law, even though it was not shown that those expenses were necessary to the administration of the estate as required by the applicable federal regulations. Id. at 676-77. According to Park 's literal reading of the statute, Congress intended the deductibility of administration expenses to be governed exclusively by state law:
 
 
 25
 [I]t appears to have been recognized in this Circuit that the deductibility of an expense under 2053(a) (or its predecessor) is governed by state law alone.... By the literal language of § 2053(a), Congress has left the deductibility of administrative expenses to be governed by their charge ability against the assets of the estate under state law. As otherwise stated, Congress has committed to the considered judgment of the states whether a particular expense is allowable as a proper or necessary charge against estate assets. In the situation before us, the expenses were admittedly allowable under Michigan law. They were paid out of probate assets and they were approved in two different accountings filed with the probate court. Hence they are deductible under § 2053(a).
 
 
 26
 Id. at 676.
 
 
 27
 Park illustrates two difficulties that have arisen from the interpretation of I.R.C. *1268s 2053(a). First, in terms of interplay between the federal statute and its corresponding regulations, it has been argued that for over seventy years the regulations have imposed an additional requirement beyond what is stated in the statute. See Paul L. Caron, The Estate Tax Deduction for Administration Expenses: Reformulating Complementary Roles for Federal and State Law under I.R.C. § 2053(A)(2), 67 CORNELL L.REV. 981 (1982). The statutory language broadly allows all administration expenses as deductions subject only to the limitation that such expenses be allowable under state law. See I.R.C. § 2053(a). The regulations interpreting I.R.C. § 2053 convey a further "necessity" requirement, that deductible administration expenses be "actually and necessarily, incurred in the administration of the decedent's estate." Treas. Reg. § 20.2053-3(a). Thus, the "necessity" requirement contained in the regulations conditions deduction on an independent evaluation of necessity beyond the statute's only expressed restriction (i.e., state law allowability). Because the regulatory power of the Commissioner is "not the power to make law," but rather is "the power to adopt regulations to carry into effect the will of Congress as expressed by the statute," see Dixon v. United States, 381 U.S. 68, 74, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965) (quoting Manhattan Gen. Equip. Co. v. Commissioner, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936)), it can be argued that to the extent that the regulations extend beyond the plain language of the statute, the regulations are subject to further judicial evaluation and possible invalidation. See generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Because of this circuit's decision in Park, as explained infra, we need not resolve this issue.
 
 
 28
 The second related difficulty with interpreting I.R.C. § 2053(a) is the relationship between federal and state law. The circuits are divided regarding the proper level of deference to state probate law when determining federal estate tax deductibility. It is clear that in this circuit Park controls; the deductibility of administration expenses under I.R.C. § 2053(a) is governed by state law alone. Park, 475 F.2d at 676; see also Union Commerce Bank v. Commissioner, 339 F.2d 163 (6th Cir.1964). Although Park 's approach has not been widely acclaimed, the Seventh Circuit has similarly concluded that state law is conclusive. Estate of Jenner v. Commissioner, 577 F.2d 1100, 1106 (7th Cir.1978) (setting forth a general rule that to ascertain whether an expenditure constitutes a deductible administration expense "recourse must be had to [state] law.") (quoting Ballance v. United States, 347 F.2d 419, 423 (7th Cir.1965)); see also Michael H. Tow, Estate of Love and § 2053(A)(2): Why State Law Should Control the Determination of Deductible Administration Expenses, 12 VA. TAX REV. 283 (1992) (advocating adoption of Park 's plain-language interpretation that state law exclusively governs the determination of administration expenses). Thus, because deductibility is exclusively governed by state law, the federal "necessity" standard plays no role in jurisdictions, such as ours, that adhere to this position.[3]
 
 
 29
 The majority of circuits faced with the determination of which sovereign's law governs federal deductibility of administration expenses have acknowledged the importance of state law, but have held that federal regulations are controlling. See Estate of Love v. Commissioner, 923 F.2d 335 (4th Cir.1991); United States v. White, 853 F.2d 107 (2d Cir.1988), cert. granted, 489 U.S. 1051, 109 S.Ct. 1309, 103 L.Ed.2d 578 (1989), cert. dismissed, 493 U.S. 5, 110 S.Ct. 273, 107 L.Ed.2d 6 (1989); Marcus v. DeWitt, 704 F.2d 1227 (11th Cir.1983); Hibernia Bank v. United States, 581 F.2d 741 (9th Cir.1978); Estate of Smith v. Commissioner, 510 F.2d 479 (2d Cir.), cert. denied sub nom. Lowe v. Commissioner, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 44 (1975); Pitner v. United States, 388 F.2d 651 (5th Cir.1967). These circuits take the position that the phrase "as are allowable" establishes merely a threshold; administration expenses must meet the federal necessity standard, and, in addition, not be foreclosed by local law. Put another way, because federal law governs the meaning of a term in the Internal Revenue Code, see Lyeth v. Hoey, 305 U.S. 188, 193, 59 S.Ct. 155, 158, 83 L.Ed. 119 (1938), an initial inquiry into whether an expense is an "administration expense" is determined by federal law as guided by the applicable Treasury Regulations. Only then should a court look to state law to ensure that the expense is not thereunder precluded. If the expense satisfies the two-step inquiry it will be deductible. Courts advancing this threshold inquiry generally support their position with three arguments: first, that the language of the Code and its legislative history do not declare that state law alone governs deductibility; second, that because the "necessity" requirement has been in effect in substantially similar form since 1919, Congress has essentially approved the requirement by regularly reenacting I.R.C. § 2053 without material changes; and third, that for important policy reasons federal interests underpinning estate taxation should not receive disparate local treatment, particularly given the importance of protecting estates from depletion by expenses incurred on behalf of the beneficiaries rather than the estate as a whole. Caron, The Estate Tax Deduction for Administration Expenses: Reformulating Complementary Roles for Federal and State Law under I.R.C. § 2053(A)(2), supra. The Tax Court has adopted the position of these circuits, reasoning that Congress did not intend "to allow the integrity of the Federal estate tax to be undermined by the vagaries of State law." Estate of Posen v. Commissioner, 75 T.C. 355, 367-68, 1980 WL 4572 (1980). Thus, according to the predominant view, the question of deductibility for federal estate tax liability is a federal question governed by the applicable federal regulations.
 
 
 30
 Respondent urges that Park was incorrectly decided and should be reversed. It is well established that a panel of this court cannot overrule the decision of another panel. "The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." Salmi v. Secretary of Health and Human Servs., 774 F.2d 685, 689 (6th Cir.1985). The Supreme Court has yet to resolve the conflict. In 1989, the Court first granted but later dismissed certiorari in a case which could have shed light upon the validity of the federal regulations, United States v. White, 853 F.2d 107 (2d Cir.1988), cert. granted, 489 U.S. 1051, 109 S.Ct. 1309, 103 L.Ed.2d 578 (1989), cert. dismissed, 493 U.S. 5, 110 S.Ct. 273, 107 L.Ed.2d 6 (1989). See generally Paul L. Caron, Must an Administration Expense Allowed by State Law also Meet a Federal Necessity Test?, 70 J. TAX'N 352 (1989). Although the executor in White claimed that a lower state court's approval of administration expenses should be controlling, White arose in the context of an IRS summons enforcement proceeding where the question was simply whether the IRS could investigate the claimed deductions. Perhaps because the right to investigate differs appreciably from determining the validity of the deduction, after hearing oral argument the Court dismissed the writ of certiorari as "improvidently granted," White, 493 U.S. at 5, 110 S.Ct. at 273. See Sharon C. Nantell & Marjorie A. Rogers, Deductibility of Administration Expenses is Not Always Black and White, 16 HAMLINE L.REV. 105, 113, 144 (1992) (discussing White 's foray in the Supreme Court and conclusions to be drawn therefrom).
 
 
 31
 Without further instruction from the Supreme Court, this circuit remains bound by Park, and the deductibility of administration expenses is governed solely by allowability under state law. To the extent that Treasury Regulations require anything more, they are inapplicable in this circuit because of the prior holding in Park.
 
 
 32
 In view of Park 's binding precedent, petitioners make two primary arguments why we should conclude that the expenses at issue are deductible. First, according to petitioners, Park dictates that approval by the Ohio probate court of the expenses at issue is conclusive for federal estate tax deductibility. Second, petitioners argue that as a matter of Ohio law the expenses to maintain and sell the decedent's residence beyond the filing date of the estate tax return were necessary and otherwise allowable. As developed below, we need only resolve the latter issue.
 
 C. State Court Approval
 
 33
 Not only have the circuits expressed differing opinions on the conclusiveness of state law, but variances also exist concerning the appropriate degree of federal court deference under I.R.C. § 2053 to lower state courts' interpretations of state probate law. Pursuant to Park, petitioners insist that in this circuit the plain meaning of I.R.C. § 2053 precludes federal court review of the deductibility of administration expenses that have been approved by the proper probate court:
 
 
 34
 If the fiduciary on the basis of his sound judgment, as approved by the probate court, feels that the estate would benefit by the sale of the real estate (regardless of the wishes of the beneficiaries) the availability of the deductions under § 2053(a) should not be denied because the respondent [Commissioner of Internal Revenue] does not deem the sale to have been necessary.
 
 
 35
 Park, 475 F.2d at 676-77.
 
 
 36
 Despite the above-quoted language, respondent argues that Park is factually distinguishable because in Park the Commissioner conceded that the expenses at issue were allowable under the state's applicable law. No such concession occurred here. Therefore, according to respondent, this circuit has never indicated how a federal court passing on the deductibility of an administration expense should determine whether that expense would, in fact, be allowable under applicable state law. Because Park simply maintained the status quo with respect to the degree of deference, respondent argues that the rule announced in Commissioner v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967), is apposite.
 
 
 37
 In Bosch, the Supreme Court considered the effect of a state trial court decree in a subsequent federal tax proceeding in the context of characterizing property interests for purposes of the marital deduction under I.R.C. § 2056. While federal authorities are bound to apply state law as explained by the state's highest court, the Court declared that Congress had only intended that federal courts give "proper regard" to the interpretation of state law by lower state courts. Bosch, 387 U.S. at 465, 87 S.Ct. at 1782-83. Moreover, the Court noted that the Commissioner was not a party to the state court proceeding, so the state court decision could not have preclusive effect. Id. at 463, 87 S.Ct. at 1781-82. Respondent suggests that because Park was decided on the heels of Bosch, Park should be read consistently with the preceding Supreme Court directive. A probate court is not the highest state court, and its approval of administration expenses would be persuasive, but not conclusive, proof of deductibility under state law. See Estate of Swallen v. Commissioner, 98 F.3d 919, 926 (6th Cir.1996) (recognizing the Bosch principle and rejecting the argument that state court property decisions have "more than persuasive force in the federal system."); Nantell & Rogers, supra at 116-17 (urging consistent application of the Bosch principle, wherein the local probate court's decree serves as an important indication of state law but not an infallible one).
 
 
 38
 Petitioners explicitly state that the probate court granted "specific approval" of the expenses at issue here. Appellant's Br. at 10, 11. However, in the present action there is nothing in the record before us to establish that the local probate court actually reviewed and approved the disputed expenses. Under Ohio probate procedures, the executor is required to file periodic accountings itemizing receipts and disbursements for the relevant accounting period. See OHIO REV.CODE ANN. § 2109.30 (Banks-Baldwin West 1996). The process then requires that every fiduciary's account "shall be set for hearing before the probate court," where the probate court "may order the account approved and settled or make any other order as the court considers proper." OHIO REV.CODE ANN. § 2109.32 (Banks-Baldwin West 1996). Petitioners have furnished copies of four accountings submitted to the probate court detailing the Millikin estate's receipts and expenses, none of which carries the probate court's mark of approval. J.A. at 199-200, 237, 266, 287. Petitioners have not included in the joint appendix any transcript from a probate court hearing or an order from the probate court approving the executor's accountings. In fact, petitioners' counsel admitted at oral argument that there was never a hearing conducted with respect to these accountings.
 
 
 39
 Moreover, the jurisdiction of an Ohio probate court to approve expenses to administer nonprobate assets is controvertible. Because Ripplestone was never part of the decedent's probate estate, respondent maintains that an Ohio probate court, a court of limited jurisdiction, is without jurisdiction to approve the expenses at issue here. Appellee's Br. at 23-25. Petitioners have not countered with a showing of sound authority for the probate court's jurisdiction to approve expenses to administer nonprobate property. To the contrary, petitioners state in their reply brief that "[t]he Probate Court did not have jurisdiction to affect the property rights of trust assets or any other non-probate asset." Appellants' Reply Br. at 4. After noting that the initial accounts involved probate assets, the brief states "[s]ubsequent accounts reflected trust funds which were used to preserve the real estate by the executor." Id. (emphasis added).
 
 
 40
 In view of the controverted nature of the probate court's jurisdiction, combined with a record that falls far short of demonstrating probate court approval, it is clear that the situation here in no way parallels the situation described in Park, where confirmed approval by a state probate court definitively determined the federal deductibility question. Therefore, we need not further address petitioners' first argument.
 
 D. Necessity of Expenses
 
 41
 Since we are bound by Park 's directive exclusively to apply state law, petitioners must demonstrate that the expenses at issue in the present case qualify for deductibility under Ohio law. Ohio probate law specifies that "[A]llowances ... which the probate court considers just and reasonable shall be made for actual and necessary expenses." OHIO REV.CODE ANN. § 2113.36 (Banks-Baldwin West 1996). Thus, despite Park 's rejection of using the "necessity" standard contained in the federal regulations, the estate still must show that the expenses it incurred with respect to the maintenance and sale of the residence after March 16, 1990, were actual, necessary, just, and reasonable under Ohio law.
 
 
 42
 The Tax Court concluded that expenses to maintain Ripplestone until March 16, 1990, were necessary, but maintenance and selling expenses beyond that point were not necessary. Tax Ct. Mem. at 14; J.A. at 27. As the Tax Court explained, the estate preserved Ripplestone until March 16, 1990, in order to effectuate the provision in decedent's will granting the Cleveland Museum of Art a right of selection of personal property. After the distribution of all personal property and the filing of the estate tax return, the estate had no reason not to distribute Ripplestone according to the trust agreement. Id. Following the appointment of $2 million of Trust B's assets to Trust A and payment by Trust B of the taxes attributable to Trust B's inclusion in decedent's gross estate, at that point Trust B had no further reason to exist and the remaining assets should have been transferred to Trust C, whereupon Trust C would bear the maintenance burden and decide whether to sell the property. Therefore, the estate's retention of Ripplestone until it could be sold benefitted Trust C's beneficiaries at the expense of the overall estate.
 
 
 43
 The Tax Court rejected petitioners' arguments that the sale was necessary to guard against the possibility of additional taxes and to facilitate allocation of the remaining funds among the twenty-eight Trust C beneficiaries. The Tax Court noted that Alexander intended to sell Ripplestone by, at the latest, March 1990, when he put Ripplestone on the market and included its estimated selling expenses on the estate tax return. It was only three years later that Alexander received notices of additional tax burdens. Tax Ct. Mem. at 16; J.A. at 29. Moreover, the Tax Court found that at the time of the decedent's death, Trust B held over $9 million in assets, excluding Ripplestone, which were more liquid than real estate and more than sufficient to cover Trust B's taxes. Id.
 
 
 44
 Like the Tax Court, we also can discern no reason why the estate would be responsible for selling Ripplestone and maintaining it beyond March 16, 1990. The trust agreement unambiguously stated that the unappointed corpus of Trust B was to be distributed to Trust C upon decedent's death. J.A. at 150. Therefore, by operation of law in carrying out the intent of the settlor, on the date of Marguerite's death (or at least at the point when the transfer became feasible because that portion of Trust B's assets appointed by Marguerite to cover estate taxes had been ascertained and paid out to the executor), Ripplestone should have been transferred from Trust B to Trust C. Even if we construe Ripplestone as a probate asset, in the administration of Marguerite's estate there would come a point in time when the executor would have to distribute Ripplestone to the preordained beneficiary, Trust C. Here, the full distribution of the decedent's personal property, the payment of taxes, and the filing of the estate tax return marked just such a milestone. As of March 16, 1990, the administration of the estate was essentially complete and the distribution of Ripplestone should have been fully accomplished.
 
 
 45
 Petitioners' contention that the relevant "distribution" was the distribution of Ripplestone to a third-party buyer is misconceived. Rather, we believe the proper "distribution" of Ripplestone was an automatic transfer to Trust C as dictated by the trust instrument. Therefore, under our view, Trust C, rather than the estate, would replace Trust B as the party responsible for maintaining and deciding whether to sell Ripplestone. The fact that Trust C, the recipient of Ripplestone, might well have immediately sold the property is irrelevant.
 
 
 46
 We are likewise not persuaded by petitioners' argument that the sale of Ripplestone by the estate was required in order to provide a cushion for speculative future tax liability. The maintenance and selling expenses at issue arose only after the filing of the estate tax return; the executor had already liquidated sufficient assets in Trust B to cover the expected tax liability. We recognize the need for flexibility and the benefit of avoiding painstaking asset-counting in order precisely to match the sale of particular pieces of property with the estimated tax liability, particularly with an estate as large as in the instant case. However, in the circumstances of this case, we are concerned only with expenses incurred after the estate tax return was filed; therefore, the meticulous numbercrunching had already occurred and sufficient assets were already set aside to offset taxes. We further note that the notices of tax deficiencies were issued over three years after Ripplestone was put up for sale. At that point, the executor was well aware of Ripplestone's environmental and zoning problems, so that, if anything, the valuation of Ripplestone would likely diminish, thereby bringing down the estate's overall tax burden and resulting in the exact outcome that occurred here, namely, an overpayment of tax requiring a refund by the IRS.
 
 
 47
 Moreover, Marguerite's will directed that when the executor certified to the trustee the amount of tax due by virtue of Trust B's inclusion in the estate, the trustee was to pay to the executor the amount so certified. J.A. at 176. Thus, in the event that additional taxes with respect to Trust B property became due, the trustee (Society) would be responsible for reimbursing the executor. If there were insufficient liquid assets to cover the additional burden, the trustee, rather than the executor, would face the decision of selling Ripplestone or otherwise amassing sufficient funds to satisfy the liability.
 
 
 48
 Petitioners construe the Tax Court's decision as requiring an executor to distribute assets immediately after filing a tax return. Appellant's Br. at 14. This is clearly not the lesson to be gleaned from the conclusion reached by the Tax Court and affirmed herein. The executor had no role in Ripplestone's automatic transfer from Trust B to Trust C. The executor became involved with Ripplestone only under the unusual scenario in this case that required Ripplestone to be maintained to effectuate the testator's intent to create a right of selection in personal property.
 
 
 49
 Insofar as the Cleveland Museum of Art had yet to finish its selection process, the maintenance of Ripplestone through March 16, 1990, was directly related to the distribution of the personal property of the decedent in accordance with her will. Thus, the estate properly deducted Ripplestone's maintenance costs incurred through March 16, 1990. In contrast, we hold that the expenses incurred in selling the property and maintaining it beyond March 16, 1990, do not constitute deductible administration expenses under Ohio law. Because there is no reason why the residence was not transferred to the designated Trust C after distribution of the personal property and the filing of the estate tax return (even if Ripplestone is considered a probate asset), and because Trust B maintained sufficient liquid assets to cover the tax burden (which was likely only to diminish in the future), the further expenses of maintaining and selling the property beyond March 16, 1990, were not incurred by the estate out of necessity.[4]
 
 III. CONCLUSION
 
 50
 We conclude that petitioners have failed to demonstrate that the expenses at issue with respect to the maintenance and sale of decedent's residence that were incurred beyond the estate tax return filing date of March 16, 1990, were necessary expenses of administration under Ohio law. Accordingly, we agree with the Tax Court that such expenses are not deductible for federal estate tax purposes. The judgment of the United States Tax Court is AFFIRMED.
 
 
 
 [1]
 Specifically, Marguerite's will provided:
 I appoint to my estate from the residue of the principal of said Trust B ..., remaining after the appointment made ... immediately above [the $2 million partial appointment to Trust A charitable beneficiaries], to be paid and disbursed to the Executor of my estate such total amount as he may certify to the Trustee under said Trust Agreement as necessary or requisite to fully pay all estate, inheritance, succession, legacy, transfer or other taxes of a similar nature ... that shall become payable by reason of my death and with respect to the said power of appointment given to me under the said Trust Agreement; said amount to be equal to the difference, if any, between the amount of such taxes and interest actually payable by my Executor minus the amount of such taxes and interest, if any, which would have been payable if such property subject to said power had not been included in my estate for the purposes of such taxes.
 J.A. at 175-76.
 
 
 [2]
 Trust B's assets included $4,165,209.59 in U.S. Treasury bills, shares of Exxon worth $3,148,029.19, shares of General Electric Company worth $567,503.64, shares of Dow Chemical Company worth $265,416.69, and $845,264 in municipal bonds. J.A. at 102
 
 
 [3]
 We note that in the instant case the application of state law is not necessarily in conflict with the federal regulations. While the latter require that deductible administration expenses be "actually and necessarily, incurred in the administration of the decedent's estate," Treas. Reg. § 20.2053-3(a), the state law counterpart provides that "[a]llowances ... which the probate court considers just and reasonable shall be made for actual and necessary expenses." OHIO REV.CODE ANN. § 2113.36 (Banks-Baldwin West 1996). Therefore, in the sense that both Ohio law and the federal regulations employ the term "necessary," they are not in conflict. See Jenner, 577 F.2d at 1105 n. 12 (because state law also required that a sale be "necessary," there was no need to address whether federal regulations add to or override the Code). Furthermore, the Supreme Court of Ohio, when comparing a similar state tax provision with I.R.C. § 2053(a)(2), stated "[b]oth use nearly identical language to describe the deductibility of administration expenses.... This congruity arises from the conscious modelling of the Ohio provisions on federal estate tax law." In re Estate of Morgan, 65 Ohio St.2d 101, 419 N.E.2d 2, 4 (1981). In view of our holding that petitioners failed to establish that the expenses at issue were necessary under Ohio law, we do not determine whether the "necessary" mandate in the state statute means the same as its counterpart in the federal regulations. As long as Park remains the law of this circuit, such consideration will always be rendered superfluous
 
 
 [4]
 No party has asked us to review the deductions that were actually included in the estate tax return, including the $150,000 estimated selling expenses; therefore, we do not address the propriety of that deduction